2024-12-19. Mr. Kindler. May it please the Court. Your Honors, the Commerce Department's application of an adverse inference to its use of facts available, or AFA, was unsupported by substantial evidence. The record establishes that Saltzgitter made every effort by using and further developing its systems used in the ordinary course of business to identify the manufacturer for the vast majority of the merchandise sold by its affiliated reseller SMSD. But it was missing, what, 20 percent? It was 20 percent by sales, but much less by quantity, approximately 95 percent by quantity. Didn't it have access to those data, but chose not to provide them? Thank you, Judge Lurie. Respectfully, I disagree. It's not that Saltzgitter chose. It's that it was infeasible using the systems maintained in the ordinary course of business, plus the additional systems that Saltzgitter developed to comply with the Department's anti-dumping duty. Due to verification, it did produce the manufacturer's names, right? I mean, it demonstrated that it did have the ability to link the other data and the manufacturer's name. Thank you, Judge Reyna. Importantly, it did so for two sales, and at issue here are 28,000 sales that required manual extraction. But they did it for two sales, but that demonstrated that they could do it. And you maintain all along, as you are right now, that it was impossible to do, that you could not do it. Well, it was impossible given the context of all the information they had to provide. Let's take a step back. There were 105,000 sales. Those are dumping cases. It's all about information. It's all about data. Absolutely. That's your evidence. Absolutely. And you didn't produce it. Well, the issue is that that... You had it. You could have produced it. And you produced it due to verification, but during the whole time of the proceeding, it seems like you were denying Commerce the opportunity or the ability to work with that data. Again, respectfully, that's not quite what happened on the record. Wait a second. What the statute says is that Commerce has to consider unreasonable burden. That's what this case is about, isn't it? Correct. You ought to be relying on the statute, which says that. As I understand Commerce's decision, the only response to unreasonable burden is that in one or two instances, you could, in a matter of minutes, have produced the information manually. But you submitted data to Commerce, an exhibit that showed to do that for the whole 28,000 entries would take a couple of years, right? Correct. That's what the case is about, is whether that's unreasonable burden and whether Commerce addressed the unreasonable burden question. Correct. And Commerce did not address the unreasonable burden. This goes to Judge Rayner's line of inquiry. At verification, SaltSkidder demonstrated that it could manually extract that information for two sales. But what was required, pursuant to Commerce's application of an adverse inference, was that SaltSkidder manually extract that information for 28,000 sales. Doing something once or twice is not the same as doing it 28,000 times. And importantly, SaltSkidder did extract that information for 77,000 sales using the electronic systems maintained in the ordinary course of business, plus the additional systems that SaltSkidder developed to deal with this issue. And the information that it did extract through those automated means accounted for 95 percent of the sales, to Judge Rayner's point, that SaltSkidder was required to produce. Now, the key question here, going back to Judge Dyke's point, is about what is reasonable and what was the burden. And this was what this court addressed in Nippon Steel, where it stated that the best of its ability standard, which is the standard pursuant to which an adverse inference is applied, requires Commerce to assess the extent of the respondent's abilities, efforts, and cooperation. It may not be drawn merely from a failure to respond, but only where it is reasonable for Commerce to expect a more forthcoming response. And here, that was not reasonable because of that manual burden. SaltSkidder, again, consists of three steel producers and five affiliated resellers. We are talking about a subset of sales for an affiliated reseller that that reseller and SaltSkidder overall used its systems maintained in the ordinary course of business. It's SAP sales. Could you have not reported a portion of the 28,000 sales? Under the... Say 10,000 or 500. Based on the record information, what SaltSkidder had to provide was sales and cost data for 184,000 sales. These sales are not the only thing at issue in this investigation. And so, again, we're dealing with three producers... You didn't answer my question. Couldn't you have produced 500 of the sales or 10,000 if you had started early when you were first asked to produce the data? Based on all the information that SaltSkidder had to produce, no. It was infeasible given the burden of cooperating with the entire investigation. But you produced the verification in minutes. Right, because that was the manual effort and it took time. Commerce verified how much time it took for those two individual sales. But you can't argue that a sample of 500 sales would have been an unreasonable burden. You could have done that. Even under your own theory that it took 10 minutes for each one, you could have done a sample. But I don't understand commerce to have found your position to be rejected because of the failure to do a statistical sample. That's something that came up in the Court of International Trade opinion, not in commerce's decision.  The issue with... And Judge Ike, you're referring to the three alternative options that SaltSkidder proposed? No, I'm not. You gave three options. The Court of International Trade said you didn't give a fourth option, which is a statistical sample. Judge Rain is suggesting you could have done 500 or 1,000. You clearly could have done. That wouldn't have been an unreasonable burden. You could have done a statistical sample. The question is whether that's a ground for rejecting the information that you did provide when commerce didn't rely on that. We do not believe it's a ground for rejecting it. Neither commerce nor the petitioners in this case ever contended that a statistical sample was necessary. What the statute requires in cases where information cannot be provided is a reasonable alternative. And that's what SaltSkidder provided here. It provided three reasonable alternatives. Now, a random statistical sample would have also been reasonable, but it was not the only reasonable option. To come back to the point... It's not a question, it seems to me, of whether the methodology is reasonable. It's a question as to whether you provided or whether this was to the best of your ability. Did you act in the best of your ability? And that's what we're looking at right now. Absolutely. And when we look to this Court's decisions and what commerce has done in other cases, acting to the best of one's ability requires maximizing efforts and what was reasonable for commerce, given the context and the associated burden. That's in the Statement of Administrative Action. And so what SaltSkidder did here was use systems that it maintains in the ordinary course of business, plus systems that it developed for the purpose of the anti-dumping investigation. And in numerous other cases, almost identical to the facts of this one, commerce has found that that is sufficient. And that is acting to the best of one's ability, even where they are unable to provide the manufacturer information for a subset of sales. Well, in Nippon Steel versus United States, we recognize that there's no clear articulation or definition for best of your ability. But we did say that it requires the respondent to do the maximum it is able to do. And that's what I'm focusing in. And after months go by and you're not submitting the data saying, I can't do it, I don't have it, you go to verification and it turns out that you do have it. And even had you submitted a hundred, perhaps this would change the picture for you. Judge Reyna, to be clear, SaltSkidder was consistent in what it said it could and could not do. And it did submit that manufacturer information for 77,000 sales. That was the result of SaltSkidder developing additional systems on top of what was used in the ordinary course of business. So it's not that SaltSkidder simply said, we can't do this, we give up. It took further steps. That was the maximum effort it could do using the systems maintained in the ordinary course of business. And that's what Nippon Steel stands for. It is about what is reasonable for commerce to expect. And reasonable in this context requires understanding what SaltSkidder had in the ordinary course of business. Now, in multiple cases, cut-to-length plate from Japan, stainless steel bar or structural steel beams, excuse me, from Germany, cut-to-length plate from Austria. Commerce was faced with highly similar, if not identical facts. And it said that requiring a manual effort, which is what it wanted here, was not reasonable. And it refused to apply an adverse inference. There is no justification for treating this case differently from those cases, especially when an agency treating like cases differently is a grounds for finding it to be unreasonable. Additionally, SaltSkidder was not an experienced respondent. This court has repeatedly found, as well as the Court of International Trade, that an adverse inference can be justified when a failure to provide information is carried out by an experienced respondent. SaltSkidder was inexperienced and both the courts and commerce have recognized that that is a salient factor. In short, commerce used an adverse inference against SaltSkidder for doing everything that it could using the systems maintained in the ordinary course of business and even modifying those systems to meet commerce's request. This is a factual issue, right? Correct. Substantial evidence. Correct. The only additional thing SaltSkidder could have done was a manual exercise, which commerce verified. That's not true. You could have done a statistical sample. Which you yourself, two minutes ago, said was a reasonable approach. And the question is, whose fault is it that you didn't turn to a statistical sample? Was that something you had to volunteer or was commerce required to say, you should do a statistical sample and that's the way out of this box? I mean, that seems to be the heart of the question.  At no point during the investigation did commerce say how SaltSkidder should provide the information. There's nothing in the statute that requires a statistical or random sample. And in fact, the three options that SaltSkidder provided... SaltSkidder talks about alternatives. If it's a reasonable burden, you have to offer alternatives. If an alternative, a statistical sample is a reasonable alternative, then that would seem to be something that perhaps you'd have to offer. Well, SaltSkidder provided options that were alternative. And in SaltSkidder's view, in a certain sense, it was just as, if not more robust than a random sampling because each of the three options covered all of those 28,000 sales. Under the three options SaltSkidder proposed, it proposed to include all, none, or some of the sales as produced by SaltSkidder. And some of the sales was based on actual verified evidence, the proportion of SaltSkidder produced plate that SMSD purchased. Each of those would have resulted in a 0% margin. Because it was based on verified record evidence, it was reasonable. And Commerce, in completely disregarding it, violated and ignored record evidence. With that, Your Honors, I do recognize I'm into my rebuttal time, and I will reserve the rest for rebuttal. Thank you. We'll save it for you. Ms. Westerkamp, and you are taking nine minutes. Yes, that's right. Good morning, and may it please the Court. Do you agree that under the statute Commerce can't impose an unreasonable burden on the respondent? Yes, I do agree with that, Your Honor. OK. So I don't really see anything in the Commerce decision that really addresses the unreasonable burden thing, other than to say, in two instances, they secured this information, and that somehow that proved that they could do it for the 128,000. Well, you know, why isn't Commerce addressing the unreasonable burden question? Doesn't it have to do that? Well, I think, Your Honor, in this case, from the very beginning, Solzgitter seemed to insist that the missing manufacturer information just didn't seem to matter, and so almost contested that that was even missing. And so when it came to Commerce did appropriately apply facts available, because in order to- lengthy exhibit showing exactly what would be required to make a manual comparison of these records to come up with the data, right? And they gave you an estimate that would take two years for over 4,000 hours of work, and they said it was an unreasonable burden. But I don't see that Commerce really responded. But I think, Your Honor, when it comes to that, is that from the start, at verification, Commerce did put in the verification checklist, you know, we need to track these sales. And so at verification, Solzgitter was able to show that it could go electronically and could figure out who the manufacturer of the plate was for those 28,000 sales. And throughout the whole proceeding, Solzgitter- Wait, I'm sorry. I don't understand what you're saying. I thought it was undisputed that for the 28,000 sales, it had to be done manually. That is right. That is correct. And so, but again, as the trial court had said, Solzgitter had basically, its proposed alternative was that separate database and with the, as Mr. Kendler said, the three different approaches. But that all resulted in a 0% margin. And here, Commerce did say that Solzgitter had not cooperated to the best of its ability because it did have access to these records. And it didn't, as the trial court had said, didn't even attempt to maybe do some kind of alternative as opposed to just not providing anything. But I don't see that Commerce said that this was, that there was another alternative that they didn't have to, that they didn't propose, which made their proposals inadequate. I don't see Commerce as saying there was another alternative that they should have  And if so, where does it say that? Well, but I think so, there's kind of two distinct issues here, right? So there's Commerce's application of facts available. And I think it's undisputed that what is missing is the manufacturer information for those 28,000 downstream sales to SMSD. And so Commerce did not even know, are those home market sales? It needed that information. So that's the first step. So is there missing information? And I think it's clear that there is. And then the second step is, well, did they cooperate to the best of their ability? Solzgitter, that is. And Commerce determined that it did not because it You're ignoring the unreasonable burden requirement, which you agree exists in the statute. Well, but the party has to definitively tell Commerce, and that's 19 U.S.C. 1677M, that it cannot access this information and has to provide an alternative. And here again, Well, they did that. They said that it would require 4,000 hours of work to do it. That's an unreasonable burden. And here's an alternative, here's a free alternative. Respectfully, Your Honor, at verification, that's kind of the final spot check, just to make sure that the information is correct. And at the first time, at verification, so we're nearly at the end of the So what you're saying is they didn't propose the alternatives and make this point early enough in the proceeding? I mean, I think that would be a fair way to say it. But also, Your Honor, that it wasn't until verification that they And I do understand Commerce did acknowledge that it would be close to 5,000 hours of work to pull the 28,000 entries. Except I think where the adverse inference comes in and the failure to cooperate to the best of its ability is that throughout this period of review or investigation, actually, Salzgitter had just refused to provide that information and refused to provide an alternative. They did provide the information because they said it would be an unreasonable burden. But it was not until the verification where they showed that they could do it and then even after that had not, other than that separate database, which had the three different options, which all resulted in a 0% margin. That was when the first time where they said, well, here's our alternative. But Commerce rejected that alternative. And I think, again, when it comes to... So there's facts available, which I think is supportive that Commerce did determine that, excuse me, determined that information was missing, right, the manufacturer. And then it goes to, okay, and so what's really in dispute here is the rate that was selected. And so Salzgitter... I'm sorry. I really don't think you're addressing my question. They supplied extensive data describing what the process was, that it would take 5,000 hours, which you agree with. And so why isn't that an unreasonable burden? So there's... The reason why it's not an unreasonable burden is, as Commerce explained, that the party has to actually tell Commerce that and approach Commerce. But it did. But at verification, and so... So you're saying it came too late? Is that the point? I mean, I think it came too late. And then also that they did not cooperate to the best of their ability. I don't know. That's a different issue. If there was an unreasonable burden, they didn't have to undertake it, right? That's correct. And the party also, though, has to propose a reasonable alternative. And in this instance, Commerce rejected the alternative that Salzgitter proposed, which was, again, the three different approaches in the database. And so Commerce did determine that they did not cooperate to the best of their ability. And as part of that, also did not propose a reasonable alternative once it became clear to Commerce at verification that they could actually access this data. And so then...   That's right. And... For 5,000 hours of work. But also, I think Judge Reyna had made this point earlier, where... I mean, this wasn't... This was months. This was... This proceeding happened over months. And so it's not as if they had the... And again, this is vital information. Commerce considered it critical information for the manufacturer of a plate. And so it's also... What would have happened if, close to verification, in preparing for verification, the appellant would have come forward and said, you've been asking for all this data. We explained there's 28,000 transactions. We haven't kept the data in a format that allows us to answer all of it. But here's 200 transactions. This is the best we can do. Would we be having a different conversation? I think very likely we would, Your Honor, where in that case, that would be, for example, a reasonable alternative that Salzgitter proposes. And I know that Judge Gordon, for example, had said that, well, maybe there could have been some kind of statistical sample to show. But as it is, there's zero information on the record as to what percentage of those 28,000 sales were the manufacturer. There's just zero information on this record. And so I think that would have been... We would be in a different scenario where, for example, with Judge Dyke, then you would have the question of, well, was it unreasonable for Commerce to still insist on getting 28,000 versus maybe, say, 500? But on this record, we don't have that. And it was because Salzgitter did have access to the information, but did not propose an alternative that was acceptable to Commerce. This is an important issue because we're faced with this question all the time. And rightly so. I mean, that's... Dumping cases, as I said before, you're dealing with data. That's the evidence of those type of cases. So what we're looking at here is not to determine or to see whether Commerce was correct with respect to the burden that answering the question here or a particular question in places on an exporter, but whether it's on the action of the exporter, whether they did the best of their ability. That's a focal point. Would you agree with that? Yes, that's the heart of this case, Your Honor. And I think here, the record does show that there's just an absence of any information, although Salzgitter could have, you know, could have done the statistical sample. Well, it's not an absence of information. There's plenty of information about the burden. You agreed to it. You agreed it took 5,000 hours. But when it comes to the actual manufacturer information, I think what they pulled two. So there's two out of 28,000. And so when it comes to missing information, that information is not on this record. And I know my time is up. Thank you, Ms. Westerkamp. Mr. Garish. Good morning. May it please the Court. Commerce properly applied an adverse inference in selecting the facts available here for the 28,000 sales in question. Salzgitter failed to act to the best of its ability in doing the maximum. So when Commerce didn't address the unreasonable burden question, why isn't that a problem? Well, I think they did, Your Honor. They talked about the fact that Salzgitter had alleged that there was an unreasonable burden, but they found, in fact, that there was not an unreasonable burden.  Because when, first of all, after Salzgitter initially claimed that this would be burdensome and time-consuming, they engaged in no further efforts to be able to report the information that was requested here. And ultimately, when Commerce asked for it at verification, they were able to provide it within minutes. Well, no, no. That's not true. They didn't provide the 128,000 for two entries. They provided it in minutes. But if you multiply two entries, minutes, you get 5,000 hours, which is what Commerce agreed was the correct number. Well, in fact, Your Honor, Salzgitter was all over the place in terms of the time that they said it would require to report this information. At one point, they said it likely would take many months. And that's, I think that is that appendix page 8046 in their third supplemental section B file. So fairly long into the proceeding, that's what they said it would take. Commerce gave them six months. They gave them four separate opportunities to provide this information. Many months. I would say six months is many months. But under the statute, the fact that they could do it isn't the be-all and the end-all. It has to be able to be done without an unreasonable burden, correct? Well, I think, first of all, actually what the statute says is if they notify Commerce promptly that they cannot provide the information and they suggest... Are you disagreeing with Commerce that there's an unreasonable burden standard in the statute? I mean, the statute doesn't talk in terms of unreasonable burden. It talks about can they produce... Who says those words specifically? What are you talking about? Well, it does say, though, that if they're unable to do it, they have to suggest an alternative form of the way they can report the sales to Commerce. They didn't provide an alternative form for reporting the sales. They provided three options, but their alternative was not to report the information at all. And that's similar to what this court dealt with in the Maverick 2 decision, where the respondents didn't provide an alternative form. They just simply said, we are not going to provide the information. But under the statute, even where there's difficulty in meeting requirements, Commerce isn't required to change its request for information. They need to consider... Even if it's not a reasonable burden? Well, I think... The statute uses those exact words, right? Right. But here, they found that there was not... They do use those words? I believe that is the case, Your Honor. But they looked at that and found that there was not an unreasonable burden here for the reasons that they laid out in the issues and decision memorandum in doing this. And they found that they could have did it when they attempted to do it. They were able to do it at very... They were able to do it for two entries. Why, on a nutshell, it's not an unreasonable burden for 128,000 entries? Well, it was for 28,000 entries. They actually were able to do it for 77,000 entries. All their other affiliates were able to do this as well. Those were computerized. Right. But this was... They had two computer systems that they could have linked up and they did it for some of the sales. They did not do it for others. But, I mean, the question here is, did they act to the best of their ability? Part of that is, what is a reasonable respondent expected to do in terms of records they maintain and information they could be called upon to present? Here, it's reasonable that a respondent should be able to provide manufacturer information for quality assurance purposes, for warranty and liability claims. In fact, the other four affiliates here did maintain all this information, did provide it to Commerce. In addition, so there was inadequate record keeping on that basis. It was also inadequate record keeping because, as SaltSkidder itself admitted, part of the manual input errors in their own system. That's at appendix page 8233. So they said they could have reported the manufacturer information for those sales, but for the input errors in their system. That is the epitome of inadequate, poor, sloppy record keeping, which the Nippon decision addresses as that's not acting to the best of your ability. The other thing, of course, is the Nippon decision requires that the respondent engage in a prompt, careful, and comprehensive investigation of its records. Here, they had six months, four separate opportunities. There's no evidence that after they initially claimed, this is burdensome, this is time consuming. There's no evidence they engaged in any additional efforts here. Now, they said that these options were alternatives. They were not alternatives. They said that they would not provide the information. I think, Judge Scott, you asked the counsel for the government, well, did Commerce ever ask them for a sample of sales? Well, it's not Commerce's responsibility to do that. The respondent has the duty to build the record. I think this court and the Court of International Trade have recognized that. And to show, here's what we're doing to try to act to the best of our ability to provide this information. They never offered that up. The three options they offered were to not provide the information at all. They would have required unsupported assumptions in providing the data, which would have given them the most favorable result possible. That's not permissible under the statute. Thank you, counsel. Mr. Kendler has some rebuttal time, two and a half minutes. Your Honors, four brief points on rebuttal. Number one, regarding the three options, and in particular option three. No one has established that option three was unreasonable. It was based on the entire universe of sales. It was based on a verified ratio, and it was based on an approach that had been verified on the record. The discussion of what is more reasonable or less reasonable is not as pertinent here. Option three was reasonable. Neither Commerce nor the domestic industry. Did that option result in a zero dumping margin? All three options resulted in a zero dumping margin. But importantly, that demonstrates that SaltScatter didn't benefit by withholding information. The fact is, any of these three options covered the entire spectrum. Treat all the sales as SaltScatter sales, none of the sales as SaltScatter sales, or some verified proportion. This shows the consistency of the information and the alternatives. The second point, the government and Mr. Garish continued to insist that we refused information, that we made no further efforts, that our explanations were all over the place. This is not true. SaltScatter was consistent in explaining the burden. I would point your honors to Appendix 57-42-43, 67-89-90, 80-43-46, and 82-37-42. Throughout the investigation, SaltScatter established the burden. It showed that it went beyond the systems maintained in the ordinary course of business. It offered alternatives. It met its duty to report the information and provide alternatives. It was Commerce that ignored them in the final determination, and as Mr. Garish said before you today, that our record keeping was sloppy. That is the third point. That is not the case. In the issues and decision memorandum, Commerce said that this was information that SaltScatter should have maintained in the ordinary course of business for occasional warranty claims. SaltScatter did. It was able to pull that information manually for an occasional warranty claim, as it did at verification. What it could not do was electronically pull all of that information for the 28,000 sales in less than, as we have discussed, 5,000 hours, and that goes to the heart of the case here. It was unreasonable, consistent with nip on steel, for Commerce to expect anything more forthcoming than what SaltScatter did. SaltScatter used the systems it had in the ordinary course of business, built on those systems, and acted to the best of its ability. Thank you, your honors. Thank you, Mr. Kendall. The case is submitted.